505 So.2d 969 (1987)
SBS-SOUTH COLLEGE MEDICAL CENTER, Plaintiff-Appellee,
v.
James J. TRAHAN, M.D., Defendant-Appellant.
No. 86-439.
Court of Appeal of Louisiana, Third Circuit.
April 8, 1987.
Rehearing Denied May 5, 1987.
Writ Denied July 1, 1987.
Kermit A. Doucet, Lafayette, for defendant-appellant.
Debra Jean Becnel, Lafayette, for plaintiff-appellee.
Before FORET, DOUCET and KNOLL, JJ.
FORET, Judge.
James J. Trahan, M.D., appeals a judgment awarding SBS-South College Medical Center monies in the amount of $24,060.31 for lease overages, legal interest from date of demand on those overages, additional monies due as adjustments to base rental pursuant to lease provisions, legal interest on the extra monies for rental, 20% attorney's fees on the principal amount recovered, all court costs, including $150 for a note of evidence taken at trial, $213 for the deposition of Thomas Becnel, and $300 for the deposition of James Trahan.

FACTS
SBS and Trahan entered into a lease agreement dated March 12, 1982. SBS is a Louisiana partnership which is the owner of an office complex located at 913 South College Road, Lafayette, Louisiana. The Becnel Company is the managing general partner of SBS. Thomas Becnel owns and is president of the Becnel Company, and *970 Patrick Gros is its secretary treasurer. Dr. Trahan is an internist physician.
Sometime in the summer of 1981, Trahan learned that a building was being developed by SBS. Trahan contacted Dr. Beacham, one of the partners of SBS, to inquire about leasing office space in the building. Trahan also contacted Gros about leasing office space in the building. Trahan met with Gros, and they discussed the prospects of leasing a portion of the building. Dr. Trahan informed the Becnel Company of requirements, was quoted the cost of such space and additional specifications for improvement of the facilities, and Trahan found the arrangements quoted acceptable. Trahan subsequently met with Dannette Daniel, a representative of the architects of the building, to discuss Trahan's requirements for the prospective office space. After several meetings with the architects, plans were finalized.
SBS and Trahan entered into a lease agreement dated March 12, 1982. The base term of the lease was five years, commencing June 1, 1982. Under the terms of the lease, Trahan agreed to pay a base rental of $2,877.50 per month, along with adjustments for operating costs and yearly percentage increases. Pursuant to Paragraph IV of the lease, lessor "agreed to cause the lease premises to be completed in accordance with plans, specifications and agreements provided by both parties, which are attached to and made a part of this lease." Lessor would not be obligated to construct or install at his expense any improvements or facilities of any kind other than those called for in the attached specifications and agreements.[1]
The allowances, standard in the industry, set out a specific number of electrical outlets, telephone sub ups, single pull switches, etc. allocated to each tenant on a per square foot basis. Tenant has the option to either stay within these allowances, at which no additional cost would be incurred, or to furnish the interior of his lease space in a more elaborate manner, thus incurring additional construction "overages". The option afforded to lessee is found in Section IV of the lease agreement which reads wholly as follows:
"CONSTRUCTION
Lessor agrees to cause the leased premises to be completed in accordance with the plans, specifications and agreements approved by both parties, which are attached to and made a part of this lease. Lessor will not be obliged to construct or install at its expense any improvements or facilities of any kind other than those called for on the attached specifications and agreements. Lessor agrees to commence and complete the construction of the building and/or improvements with reasonable diligence."
As stipulated at trial, Trahan, after meeting with SBS, as well as the architects and construction personnel, chose certain finishes over and above those provided by the lessor totalling $24,060.31. Subsequent to the selection of the overages, Trahan and SBS personnel, specifically Becnel and Gros, met to discuss the cost of the improvements and the method of paying the overages. Gros scheduled a meeting with Trahan to discuss the proposed lease and the overages; however, Gros did not keep the appointment for the meeting. During January, 1982, and as a result of Gros' conduct, Trahan decided to withdraw from the proposed lease. Trahan informed two of the owners of SBS of his decision to withdraw. Becnel contacted Trahan in February or March of 1982 to discuss Trahan's position and to persuade him to continue with the proposed lease. Trahan testified that Becnel offered concessions to persuade him to continue with the lease. Trahan testified that Becnel offered to amortize the overages throughout the term of the lease in the base rental. This arrangement is the same given the owners of SBS who are also tenants. Trahan agreed that if the total base rental was within his *971 budget, he would be willing to go through with the proposed lease.
SBS contends that the norm is to pay the overages in one lump sum. As a concession to lessee, SBS offered to allow Trahan the option of amortizing these costs by paying a monthly sum in addition to the base rent. SBS contends that Trahan preferred to pay the overages in one lump sum upon completion of construction and that it caused a lease to be prepared reflecting only the standard base rental per square foot without allowing for any tenant coverage amortization.
The exact area to be leased was not quoted; however, discussions between Becnel and Trahan centered around the area encompassed by Suite 205, which was the designation given Trahan's proposed lease space. Becnel quoted Trahan a base rental of $2,877.50. The dispute centers around whether or not the base rental figure includes amortization for overages.
Prepared leases were then circulated in multiple originals[2] for signatures during the month of March, 1982. Improvements were made to the building as specified by Trahan. However, the building was not ready for occupancy until July 4, 1982. Trahan began paying rentals of $2,877.50 as provided in the lease. By letter dated September 23, 1982, Gros informed Trahan that the tenant improvement overages were due and stated that Trahan could amortize said overages by increasing the rent by $333.43 per month.
Trahan responded by letter dated October 13, 1982, informing Becnel that the overage was already in the rental payments of $2,877.50 per month and offered to vacate the premises if that arrangement was not satisfactory. In the interim, Trahan made all rental payments due under the terms of the lease and as invoiced by SBS. There is no contest between the parties herein concerning the lease payments due and paid from July 1982 through August 1984.
The lease does not provide the price per square foot. However, the lease does provide that the square footage of the leased premises is 2302 and that the monthly cost is $2,877.50. Multiplying the monthly rental by 12 and dividing it by the square footage, a per square foot charge of $15.00 is computed. This figure is consistent with the testimony of Becnel and Gros at trial.
The trial court granted judgment in favor of plaintiff finding that Trahan failed to pay the overages and portions of the rent and further denying defendant's plea of accord and satisfaction regarding the rental payments. Oral reasons for ruling were issued on October 4, 1985, and amended reasons were issued on October 31, 1985. Judgment was signed on November 8, 1985.
Trahan filed a motion for a new trial on November 12, 1985, which was heard on January 27, 1986. The trial court denied the motion on the basis of its findings that all negotiations and agreements were intended to be contained within the four corners of the contract executed. Because no allegations of error, mistake, fraud, duress, etc. were made, the court refused to consider parol evidence. From such a finding Trahan has obtained an order for a suspensive appeal. SBS has answered the appeal requesting an increase in the attorney's fee awarded by the trial court and requesting damages against Trahan for filing of a frivolous appeal.

OVERAGES
This case involves interpretation of a written lease. The parties to the lease do not agree on the method to be used for the payment of overages for improvements placed in the leased premises at Trahan's direction.
Courts are bound to give legal effect to all written contracts, including contracts of lease, according to the true intent of the parties, and this intent is to be determined by the words of the contract when these are clear, explicit, and lead to no absurd consequences. Thomas v. Knight, 457 So.2d 1207 (La.App. 1 Cir. 1984). The lease provides that lessee shall pay for all construction costs of improvements *972 requested by lessee and placed in the leased premises which are above the standard improvements provided by lessor. Lessee ordered overages to the building which resulted in an amount of $24,060.31. Trahan agrees he was liable for this overage amount but states he thought the overage was included in the base rental of $2,877.50 per month by amortizing the overage over the term of the lease. SBS contends that the overage was not included in the base rental.
Because Trahan admits that he requested such overages, and because he signed a lease making him responsible for the payment of such improvements and overages, we find that the trial court was correct in concluding that Trahan owes SBS $24,060.31. Although the lease does not specifically set out a method of payment of overages and does not set out a specific cost per square foot, the cost per square foot is readily determinable from the lease provisions.[3] The lease states that the leased premises are comprised of 2,302 square feet. Although the actual square footage of Suite 205 is somewhat less than 2,302 square feet, Trahan is also responsible for his pro rata share of the common areas.
Trahan did not contest the number of square feet alloted to the leased premises on the lease, and he has not alleged error or fraud at the trial court level or on appeal; therefore, he is bound by the terms of the lease he signed.
The trial court ruled that the significant date in determining the accrual of interest on such overages due was dictated by LSA-C.C. art. 2000 which states that, "When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due." The trial court ruled that the overage amount was to be paid in one lump sum and therefore concluded the interest began to accrue at the rate of legal interest on the date it was due, i.e., the date of written demand, September 23, 1982.
We conclude the ruling of the trial court on the issue of overages and on the issue of interest is correct.

BASE RENTAL ADJUSTMENTS AND OPERATING INCREASES
The lease provides that every year, on its annual date, the rent will increase by 5%. The lease also provides that the base rent shall be subject to an adjustment each calendar year to compensate for changes in lessor's operating costs. The lease is not ambiguous; it is clear and explicit as to these provisions. The trial court was correct in its interpretation thereof.
Trahan tendered partial payments for rentals due but has yet never paid the full amount of rental since September, 1984. In accordance with the terms of the lease and in accordance with the trial court's ruling, Trahan owes legal interest on the difference in the amount tendered and the actual rental due for each month since September, 1984, where full payment of rental was not tendered.

ATTORNEY'S FEES
The lease agreement provides for attorney's fees in the amount of 20% of the amount due on any such claim. Requisite demand was made upon Trahan by written letter of September 23, 1982 and thereafter for the difference in the partial payment tendered and the full amount of rental due. Therefore, the trial court's judgment awarding 20% of the principal amount recovered hereunder as attorney's fees is affirmed.
We disagree with SBS's contention that the judgment should be modified to increase the amount of attorney's fees from 20% of the principal amount recovered to 20% of the total amount collected under the judgment. Appellee urges that attorney's fees may be awarded on interest due. However, the lease provides that attorney's fees shall be awarded in the amount of 20% of the amount due under the lease, which does not include the legal interest computed thereon.

PENALTIES AND ATTORNEY'S FEES FOR FRIVOLOUS APPEAL
Plaintiff has requested damages for frivolous appeal. There is no merit to this demand, and it is denied.

*973 CONCLUSION
Trahan did not allege that the trial court erred in excluding any proffered evidence because of his failure to plead error in the trial court. Trahan does not ask us to consider any proffered evidence on the issue of error. Consequently, Trahan's proffer is not properly before us.
The transcript of the proceedings, as well as the briefs submitted by both counsel, have convinced us that the lease price was computed at a rate of $15 per square foot per year for 2302 square feet. Consequently, the base monthly rental was $2,877.50, the exact amount called for in the lease.
Incurred overage costs in the amount of $24,060.31 which Trahan failed and refused to pay (and alleged were part of his monthly rent) are Trahan's responsibility under the terms of the lease. The trial court, after having been afforded the opportunity of reading the lease, viewing the witnesses, their demeanor, and the evidence, ruled in favor of plaintiff. We affirm the trial court's judgment.
All costs of this appeal are assessed against appellant, James J. Trahan, M.D.
AFFIRMED.
NOTES
[1] Plaintiff alleges that attached to said lease, at the time of its execution, were documents outlining both the general tenant allowances and the personal options as approved and requested by lessee, Trahan. Trahan denies that such documents outlining allowances and options were attached to the lease at the time of its execution.
[2] The record contains leases which are identical in all respects except the dates appearing above the signature lines. One lease is dated March 19, 1982, the other July 7.
[3] $2,877.50 × 12 = $34,530 ÷ 2302 = $15 per sq. foot.